# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CARLA COX**
          **Plaintiff,**

      **v.**                        **Case No. 10-C-1027**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
          **Defendant.**

## DECISION AND ORDER

Plaintiff Carla Cox applied for supplemental security income ("SSI") benefits, claiming that she could not work due to mental impairments and obesity. (Tr. at 174.) The Social Security Administration ("SSA") denied her application initially (Tr. at 78, 79, 100) and on her request for reconsideration (Tr. at 80, 81, 110), as did an Administrative Law Judge ("ALJ") after a hearing (Tr. at 82). The Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the SSA's final word on the application. See Scott v. Astrue, No. 10-2487, 2011 WL 3252799, at *4 (7th Cir. Aug. 1, 2011). Plaintiff now seeks judicial review of the ALJ's decision.

## I. JUDICIAL REVIEW

The reviewing district court examines an ALJ's decision to determine whether substantial evidence supports it and the ALJ applied the proper legal criteria. Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Campbell v. Astrue, 627 F.3d 299, 306 (7th Cir. 2010). Under this deferential standard, the court may not displace the ALJ's judgment by

reconsidering facts or evidence, or by making independent credibility determinations. If reasonable people could differ concerning whether the claimant is disabled, the court must affirm the ALJ's decision denying her claim. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

Nevertheless, the court must conduct a critical review of the entire record, McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011), and may not uphold a decision, even if there is evidence in the record to support it, if the decision ignores contrary evidence, fails to provide a bridge from the evidence to the result, or rests upon flawed logic or serious errors in reasoning, see, e.g., Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009); Indoranto v. Barnhart, 374 F.3d 470, 474-75 (7th Cir. 2004); Carradine v. Barnhart, 360 F.3d 751, 754-56 (7th Cir. 2004); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996). And because judicial review is confined to the reasons supplied by the ALJ, the Commissioner's lawyers may not later fill in the gaps in the ALJ's analysis. See Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002).

## II.  DISABILITY STANDARD

The ALJ determines disability under a sequential, five-step test. 20 C.F.R. § 416.920. At step one, the ALJ asks whether the claimant is engaged in substantial gainful activity ("SGA"). If the claimant is working at SGA levels, she will be found not disabled. 20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not working, the ALJ determines whether she suffers from a severe, medically determinable impairment or impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c).

Third, if the claimant has a severe impairment, the ALJ determines whether that impairment qualifies as presumptively disabling under the Listings. 20 C.F.R. §

2

416.920(a)(4)(iii); <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1.  In order to meet a Listing, the claimant must present evidence showing that she satisfies each of its "criteria." <u>Maggard v. Apfel</u>, 167 F .3d 376, 379-80 (7th Cir. 1999).  For instance, the mental impairment Listings generally consist of three sets of criteria – the paragraph A criteria (a set of medical findings that substantiate the presence of a particular mental disorder), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings).  <u>See</u> <u>Windus v. Barnhart</u>, 345 F. Supp. 2d 928, 931 (E.D. Wis. 2004).  The B criteria have four components: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, and four or more.  The last point on each scale represents a degree of limitation that is incompatible with the ability to work.  20 C.F.R. § 404.1520a(c)(4).  Certain Listings may also be met if the claimant has marked limitations in two of these areas.  <u>E.g.</u>, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).

Fourth, if the claimant's impairment does not meet or equal a Listing, the ALJ determines whether she retains the residual functional capacity ("RFC") to perform her past relevant work.  20 C.F.R. § 416.920(a)(4)(iv).  RFC is the most an individual can do, despite her impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule.  SSR 96-8p.

Fifth, if the claimant cannot perform her past work (or if she lacks a relevant work history), the ALJ determines whether, given her RFC, age, education, and work experience,

she can make the adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). The claimant bears the burden of presenting evidence at steps one through four, but at step five the burden shifts to the SSA. See, e.g., Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The ALJ may meet this burden by obtaining testimony from a vocational expert ("VE") regarding other jobs the claimant could do despite her limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336–37 (7th Cir. 1994).

## III.  THE RECORD

### A.  Plaintiff's Application

On August 16, 2007, plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of February 6, 2005. (Tr. at 85.) However, plaintiff later amended the onset date to August 16, 2007, after her date last insured for purposes of DIB, so the claim proceeded as one for SSI only. (Tr. at 14.)

### B.  Medical Evidence

#### 1.  Treatment Records

In July 2007, plaintiff began receiving mental health treatment from Lauren Nelson, Ph.D, at the Acacia Clinic. Initial notes record diagnoses of major depression, panic disorder, and rule out attention deficit hyperactivity disorder ("ADHD"), with a GAF of 48.[1] (Tr. at 304.)

---

[1]"GAF" – the acronym for "Global Assessment of Functioning" – rates a person's psychological, social, and occupational functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "absent or minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others. Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32–34 (4th ed. 2000).

In her intake summary, Dr. Nelson noted that plaintiff dropped out of school in grade nine but always had trouble understanding and paying attention. "No job has lasted for her." (Tr. at 302.) She indicated that she had been taking GED classes for two years. (Tr. at 296.) Plaintiff reported preoccupation with worries about her child and finances; anxiety creating shortness of breath, headaches, and chest pressure; and daily panic attacks. She also reported problems with her temper and anger control. (Tr. at 299.) Plaintiff commenced individual therapy with Dr. Nelson, with the goal of improving mood and coping skills (Tr. at 293), and Dr. Laurens Young, a psychiatrist, prescribed medications including Trazodone, an anti-depressant (Tr. at 289).

During her August 3, 2007 session with Dr. Nelson, plaintiff reported feeling very stressed and getting angry at her W-2 caseworker, her brother, and strangers on the bus. Dr. Nelson noted mood somewhat more depressed, with suicidal thoughts but no plans or means. (Tr. at 292.) On August 13, plaintiff reported feeling very depressed and overwhelmed. Dr. Nelson noted depressed mood and anxiety when plaintiff was on the bus or in crowds. She remained depressed with severe panic disorder. (Tr. at 290.) On August 27, plaintiff continued to be depressed and irritable, very slightly improved now that she was receiving help. (Tr. at 287.) On September 5, she seemed more depressed, with passive suicidal ideation. (Tr. at 286.) Dr. Nelson completed a mental impairment medical assessment form on that date, listing diagnoses of axis I: major depression and panic disorder, Axis II: learning disability, Axis III: obesity, and a GAF of 45. Dr. Nelson identified a variety of symptoms, including appetite disturbance, decreased energy, psycho-motor agitation, suicidal ideation, intrusive recollections of traumatic experiences, difficulty thinking and concentrating, poor memory, sleep disturbance, recurrent panic attacks, anhedonia, hostility/irritability, mood disturbance/lability, and social

5

withdrawal/isolation, which would frequently interfere with the attention and concentration needed to perform even simple work tasks. Dr. Nelson further stated that plaintiff was unable to perform or be exposed to public contact, detailed or complicated tasks, close interaction with supervisors/co-workers, exposure to work hazards, strict deadlines, and fast paced tasks. (Tr. at 397.)

During their September 13 and 21, 2007 sessions, Dr. Nelson found plaintiff's mood somewhat improved, not as irritable. (Tr. at 284, 285.) Plaintiff canceled her September 28 session because she had "too many children to watch." (Tr. at 313.) On October 1, plaintiff reported still feeling depressed, with no benefit from medication. Dr. Nelson noted depressed mood, somewhat improved, with fear and panic when she went out. (Tr. at 312.) Plaintiff was a no call/no show on October 15. (Tr. at 311.) On October 19, Dr. Nelson assessed depressed mood, somewhat improved. (Tr. at 310.) On November 20, plaintiff told Dr. Youngs she was still depressed and did not think the medications were doing anything, leading Dr. Youngs to change the prescriptions. (Tr. at 362.)

Plaintiff was a no call/no show with Dr. Nelson on November 21 and December 5, 2007 (Tr. at 360, 361) and canceled on December 12 when her car was plowed in (Tr. at 359). On December 19, she reported feeling somewhat less depressed, but more irritable. (Tr. at 358.) On January 3, 2008, she reported feeling more depressed with more anger episodes, relating a physical altercation with her brother's girlfriend. (Tr. at 356.) On January 9, she reported feeling better, less stressed, with no anger episodes. Her mood was only slightly depressed. (Tr. at 355.) On January 17 and February 8, plaintiff canceled due to car and weather problems. (Tr. at 352, 353.) On February 15, her mood was depressed, and affect anxious and frustrated. (Tr. at 351.)

6

On February 15, 2008, Dr. Nelson completed another report, listing diagnoses of major depression, panic disorder, learning disability, and rule out bipolar disorder. (Tr. at 377.) Dr. Nelson indicated that due to a learning disability plaintiff had cognitive difficulties with communicating her needs, following instructions, and engaging in complex tasks that required judgment. Due to her mental health problems, plaintiff had low tolerance for frustration, difficulty working around others, difficulty controlling anger, socially inappropriate responses, difficulty with reality interpretation, difficulty being in unfamiliar environments, difficulty with decision-making, panic attacks, and difficulty with impulse control. Asked the number of hours per day plaintiff could participate in activities/work within these restrictions, Dr. Nelson wrote "0." Dr. Nelson further indicated that plaintiff needed in-home schooling because of anxiety and anger. (Tr. at 378.)

Plaintiff was admitted to the Aurora Psychiatric Hospital on July 31, 2008 (Tr. at 407) depressed and "not doing well." (Tr. at 481, 483.) She reported increased depression and difficulty functioning, with some passive suicidal thoughts but no plan or intent. (Tr. at 499.) She stated that her medications of Fluoxetine and Remeron had not worked, and she stopped taking them three weeks ago. She reported long-standing problems with depression and anxiety, as well as oppositional behavior, isolation, feelings of paranoia, and compulsive behaviors such as hand-washing, cleaning, re-arranging, and counting. (Tr. at 483.) Dr. Russell Temme diagnosed major depressive disorder, recurrent, severe; obsessive-compulsive disorder; and rule-out panic disorder versus agoraphobia, with an admitting GAF of approximately 45, and prescribed Seroquel and Effexor. (Tr. at 485.) During an assessment with Dr. Venkatarama Rao, plaintiff reported crying, feeling sad, expressing a lot of anger (sometimes taking it out on her three-year-old child), mood swings, and poor sleep. (Tr. at

7

486.)  Plaintiff's medical exam was essentially normal, and Dr. Rao deemed her medically stable for participation in the partial hospitalization program.  (Tr. at 487-89.)  She discharged on August 8, 2008, with a GAF of 55 (Tr. at 497), medications including Fluoxetine, Remeron, Seroquel, and Effexor (Rr. at 498), and instructions to follow-up for therapy with Danielle Davino, MSW, and psychiatric appointments with Dr. Zeba Sami (Tr. at 398).

Plaintiff saw Davino on August 13, 2008, feeling agitated and depressed.  (Tr. at 420.) Davino noted diagnoses of bipolar disorder and obesity, with a GAF of 50.  (Tr. at 421.)  Goals of therapy were listed as anger management, coping, maintaining sobriety, obtaining a job or GED, and reducing isolation.  (Tr. at 421.)  Plaintiff returned to Davino on August 22, "stable" and "maintaining current status."  (Tr. at 415.)  Plaintiff indicated that she had to force herself to take her daughter to the park as it was hard to be around other people.  She further indicated that she had been quick to anger and get into fights since she was a child.  (Tr. at 415.)  Plaintiff saw Dr. Sami on August 27, with a GAF of 45, and medications including Trazodone.  (Tr. at 416-19.)  She saw Davino the next day, again "stable" and "maintaining current status."  (Tr. at 422.)  Her diagnosis and treatment plan remained the same.  (Tr. at 422.)  Plaintiff returned to Davino on September 3, again "stable" and "maintaining current status." (Tr. at 423.) Her diagnosis and treatment plan again remained the same. (Tr. at 423.) She also saw Dr. Sami that day, with medications continued.  (Tr. at 424.)  On September 10, plaintiff told Davino she went to a wedding out of state, felt panicky, and dealt with it by talking to her sister, walking, and maintaining space.  She reported feeling less moody and spending more time with her daughter.  They also discussed her obsessive compulsive behaviors such as hand-washing after touching anything.  (Tr. at 425.)  Further notes from September 2008 list plaintiff as "stable" and "maintaining current status," with continued issues of anxiety

manifested by nail biting, cleaning, face pinching, and hand washing.  (Tr. at 426.)

On October 10, 2008, plaintiff advised that she was pregnant, and that her moods had been more stable.  (Tr. at 428.)  Dr. Sami took plaintiff off her medications due to the pregnancy, and as a result she experienced mood swings, reporting an argument that turned violent.  (Tr. at 429-30.)  During her November 2008 visits, plaintiff reported feeling sick and unmotivated.  She also reported continued depression since being taken off of her medications.  (Tr. at 426, 431-32.)  On December 3, she reported using spurts of energy to clean and discussed a situation where she got angry and tore her house up.  (Tr. at 433.)  On December 10, she reported hostile, aggressive thoughts towards her ex-boyfriend.  (Tr. at 434.)  During her January 21, 2009, session with Davino plaintiff indicated that she got to the point of physically assaulting her baby's dad, resulting in police involvement – this despite the fact that she had apparently been put back on medication, which she reporting taking as prescribed.  (Tr. at 435.)

On January 30, 2009, plaintiff saw her OB/GYN, Dr. Luther Gaston, complaining of headaches.  She also complained of diffuse joint pain, concerned that she may have lupus.  (Tr. at 545.)  Dr. Olson recommended Tylenol, 1 gram every six hours for headaches, and ordered tests to evaluate for lupus.  (Tr. at 546.)

During her February 16, 2009 session with Davino, plaintiff reported reduced stress because she had not seen her baby's dad.  (Tr. at 437.)  On March 1, she reporting feeling agitated, but she was able to take her daughter to the circus.  (Tr. at 438.)

On March 4, 2009, plaintiff advised Dr. Gaston that she ran out of Zoloft about one month ago and had no medication since then.  She complained of increasing depression, mood changes, irritability, fatigue, anhedonia, and occasional crying but denied any suicidal thoughts.

9

(Tr. at 547.)  Dr. Gaston had her restart Zoloft for worsening depression and referred her to psychiatry for management of bipolar disease in pregnancy.  He also referred her to neurology for persistent headaches.  (Tr. at 548.)

During her March 18, 2009 session with Davino, plaintiff reported feeling irritable and moody, paranoid and insecure, and anxious and snapping easily.  She reported not taking her medication as prescribed, as she lost her prescription.  (Tr. at 440.)  On April 7, plaintiff reported that she had been cleaning, caring for her daughter, and felt real tired with her pregnancy.  She was still irritable but had not been seeing her ex.  (Tr. at 441.)

On April 8, 2009, plaintiff told Dr. Gaston that she had not been taking her medications until the last few days due to not having a refill on prescriptions.  She also reported recently having an abdominal abscess drained at St. Luke's Hospital.  She further complained of headaches, which the doctor thought probably pregnancy-related but possibly a migraine.  He also provided medication for a urinary infection.  (Tr. at 554-59.)  On April 30, plaintiff advised Dr. Gaston that she was experiencing mood swings, anhedonia, anxiety, irritability, and fatigue. She indicated that she had not been taking her medication for the past one to two weeks and did not want to take her medication.  Dr. Gaston advised her of the importance of medication therapy in pregnancy to prevent future complications related to bipolar disorder, either later in pregnancy or post-partum.  She was previously prescribed Zoloft and Trazodone, and was asked to restart the medication.  (Tr. at 563.)

Plaintiff saw Davino on May 26, 2009, feeling uncomfortable and irritated, and back on cleaning spurts.  (Tr. at 443.)  Plaintiff gave birth to her second child on June 18 and returned to see Davino on June 30, feeling irritable and tired, but finding the baby beautiful and enjoying taking care of him.  She also felt less aggressive towards her children's father.  (Tr. at 444.)

Dr. Sami recommended medications, including Zoloft and Trazodone, and on July 7, plaintiff reported attempting to adjust to them and a new baby. (Tr. at 446-47.) In August 2009, she reported feeling less agitated on her medication. (Tr. at 451.)

On August 28, 2009, plaintiff saw Dr. Cheryl Gupta, complaining of pain in her upper abdomen and recent weight loss with intermittent nausea. She also complained of right shoulder pain, which Dr. Gupta found consistent with gastroesophageal reflux disease ("GERD") or gall bladder pathology. She further reported an ongoing history of swollen lymph nodes, for which she was taking Linezolid per her infectious disease specialist at St. Francis Medical Center. She reported being advised that this medication could cause serious side effects if taken with her psychiatric medication, Zoloft, so she stopped taking that as well as Geodon and Trazodone. She reported feeling more irritable but denied thoughts of harming self or others. (Tr. at 539.) She also reported taking Oxycodone on a more frequent basis than would be ideal, being prescribed this after having an abscess on her neck lanced. She also reported taking it for ankle pain, epigastric pain, and shoulder pain. She indicated that Dr. Gaston had completed a rheumatoid work-up, which was lupus negative. Dr. Gupta expressed concern that plaintiff was non-compliant with psychiatric medications and had not been up front with her psychiatrist. (Tr. at 540.) Plaintiff indicated she would re-start on her medications when she completed the Linezolid. She continued to see her counselor. Dr. Gupta assessed epigastric pain with weight loss, likely GERD but possibly gall bladder pathology, prescribing Nexium. She also assessed somatic dysfunction of the thoracic spine. (Tr. at 541.) If the Nexium controlled her epigastric symptoms, then osteopathic manipulative treatment would be performed regarding her concern of chronic right upper back pain. (Tr. at 542.)

Plaintiff returned to Dr. Gupta on September 15, 2009, complaining of heartburn and

11

shoulder pain, unimproved since her last visit. She reported further weight loss but was tolerating mild foods such as oatmeal without any discomfort. She also complained of shoulder pain, requesting osteopathic manipulation. (Tr. at 535.) Dr. Gupta performed manipulation on the right upper extremity, thoracic region, and lumbar region. Plaintiff reported unwillingness to pay the $25 co-pay for the GERD medication previously prescribed but was willing to take Ranitidine, and a prescription for that was provided. (Tr. at 536.)

On October 5, 2009, plaintiff was admitted to the Aurora Psychiatric Hospital due to an increase in suicidal ideation and depressive symptoms. She stated that she had not taken her medications for several months because of no insurance benefits and an inability to afford her prescriptions. (Tr. at 462.) At her initial assessment, she reported feeling depressed, dysphoric, and somewhat anxious, with vague suicidal ideation. Dr. Sami discontinued Trazodone, ordered Ambien nightly, and decreased Geodon. Her mood improved with this course of treatment, and she was discharged on October 8, 2009. Dr. Sami diagnosed bipolar disorder and anxiety disorder, not otherwise specific, with a GAF of 35 on admission, 50 at the time of release. (Tr. at 459, 463.) She was discharged with medications of Ambien, Geodon, and Zoloft. She was to follow-up with Davino on October 14 and Dr. Sami on November 10, and to see her primary doctor regarding mildly elevated blood pressure. (Tr. at 460.)

On October 14, 2009, plaintiff returned to Davino, reporting symptoms of depression, irritation, hopelessness, and some anxiety. (Tr. at 453.) On October 19, she reported less stomach pain since undergoing gall bladder her surgery but found herself crying randomly. (Tr. at 454.) On October 26, she reported anxiety symptoms while driving and feeling overwhelmed. (Tr. at 455.) During her November 2009 sessions, plaintiff reported reaching the goal of going to church again but stated that she could not keep a job due to panicking

12

around people.  (Tr. at 457-58, 515-16.)  Dr. Sami continued her on Trazodone, Zoloft, and Abilify.  (Tr. at 514.)

On November 3, 2009, Davino and Dr. Sami completed a mental impairment medical assessment form, listing diagnoses of major depressive disorder and rule out bipolar disorder, with symptoms of appetite disturbance, decreased energy, suicidal ideation, difficulty thinking or concentrating, sleep disturbance, hostility/irritability, mood disturbances/lability, and social withdrawal/isolation.  They opined that she would be absent more than four days per month as a result of her impairments.  (Tr. at 411.)  Under the B criteria, they checked moderate limitation of ADL's, social functioning, and concentration, and three episodes of decompensation.  They further indicated that plaintiff's mental disorder resulted in marginal adjustment, such that even a minimal increase in mental demands or change in environment would cause her to decompensate.  (Tr. at 412.)  Finally, they indicated that she would have significant difficulties with attention and concentration, performance within a schedule, completing a normal workday without interruptions from symptoms causing an unreasonable number of rest periods, performing accurately and at a consistent pace, accepting instruction and criticism from supervisors, and working in coordination with co-workers.  (Tr. at 413.)

On December 1, 2009, plaintiff returned to Dr. Gupta regarding her blood pressure, with Dr. Gupta prescribing Hydrochlorothiazide,[2] and follow-up regarding her right shoulder upper back discomfort.  She reported good response to osteopathic manipulation, but she was unable to follow up secondary to losing her insurance.  She also related her recent psychiatric

---

[2]Hydrochlorothiazide, a "water pill," is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease.  It causes the kidneys to get rid of unneeded water and salt from the body into the urine. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000714/.

hospitalization. She had been prescribed Abilify but was scared to take it due to possible side effects. After being provided information, she was agreeable to initiating this medication. She also complained about joint pain and left wrist pain, which would be addressed at a later visit. She reported feeling well overall, aside from occasional headaches and dizziness, which she attributed to her blood pressure. She also reported recent gall bladder surgery, from which she was recovering well. (Tr. at 530-32.)

During her December 10, 2009 session with Davino, plaintiff discussed her work history, indicating that she got into fist fights with customers. She indicated that she tried to control herself for the sake of her kids but felt that her attitude would get her in trouble if she went out a lot. She also reported having a fight with her aunt about six months previously, and that they hadn't talked since. (Tr. at 513.)

Plaintiff returned to Dr. Gupta on December 18, 2009, complaining primarily of back pain. (Tr. at 526.) She also complained of lower extremity edema, with Dr. Gupta advising her to elevate her legs above the level of her heart for about two hours per day, and that she should exercise by walking at least twenty minutes per day in order to actively mobilize the fluid collection. She was also to continue Hydrochlorothiazide for her blood pressure. (Tr. at 527.) Dr. Gupta performed brief osteopathic manipulation for back pain, ordered an MRI due to concerns of possible disc pathology, and referred her for physical therapy. (Tr. at 528.) In an undated note, Dr. Gupta wrote: "Patient should elevate her legs above the level of her heart for 2 hours daily and walk for 20 minutes daily due to her lower extremity edema." (Tr. at 502.) In a December 18, 2009 note, Dr. Gupta indicated: "Patient should avoid standing or sitting for prolonged periods of time d/t chronic back pain, neuritis, neuropathy." (Tr. at 503.)

On January 9, 2010, plaintiff and Davino discussed her difficulty in obtaining a GED.

She also reported feeling irritable, with mood swings. She went to Wal Mart and tried to stick it out but ultimately went outside to escape the crowds. (Tr. at 512.) On January 12, Dr. Sami increased Abilify and continued Trazodone and Zoloft (Tr. at 511), and plaintiff advised Davillo that she had a panic attack while undergoing an MRI (Tr. at 510). On January 22, plaintiff advised that she was trying to focus on being a parent to her kids, and that her aunt had reached out to her after their falling out. (Tr. at 509.) On February 1, she expressed irritation with her kids' father for not doing more. (Tr. at 508.) On February 12, she indicated a desire to eat better (Tr. at 507) but on February 17 she reported backsliding, eating chocolate when depressed (Tr. at 505). On March 2, they discussed anger management. (Tr. at 504.) During virtually all of their visits, Davino checked the boxes for "stable" and "maintaining current status."

Plaintiff saw Dr. Gupta on February 15, 2010, for follow up regarding her back pain. She reported that she went to the MRI but could not complete it secondary to claustrophobia. She indicated that she had not yet initiated physical therapy, and her low back pain had been persistent. (Tr. at 522.) She reported that her mental health was better, and she was taking Abilify, Trazodone, and Zoloft, which she reported was effective for her. (Tr. at 523.) Dr. Gupta ordered an open-sided MRI and physical therapy. (Tr. at 524.) The February 23, 2010, MRI revealed congenital lumbar canal narrowing, a degenerated L5-S1 disc, and multi-level facet degenerative changes, most severe at L5-S1, resulting in left-sided foraminal narrowing at L5-S1. (Tr. at 517-18.)

On March 18, 2010, plaintiff returned to Dr. Gupta, regarding her chronic mid- and low back pain, no better or worse since the previous visit. She reported some generalized weakness but could ambulate at home and care for her two children. She agreed to follow up

15

with pain management. (Tr. at 519.) Dr. Gupta reviewed the MRI results, finding it unnecessary to refer her to neurosurgery at that time. Rather, she was referred to pain management for their input regarding possible treatment. Plaintiff reported interest in weight loss, recognizing that her weight was likely the primary factor with regard to back pain. (Tr. at 520.)

### 2.    SSA Consultants

On November 29, 2007, Eric Edelman, Ph.D., completed a psychiatric review technique form ("PRTF"), finding no medically determinable impairment prior to March 31, 2006, the date last insured for DIB purposes. (Tr. at 314.) On the same date, Dr. Edelman prepared a current assessment, evaluating plaintiff under Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (Tr. at 328.) Under the B criteria, he found mild limitation of ADL's; moderate limitation of social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 338.) The evidence did not establish the presence of the C criteria. (Tr. at 339.) In an accompanying mental RFC report, Dr. Edelman found no significant or only moderate limitation in the mental work activities listed on the form. (Tr. at 342-43.)

On March 10, 2008, Roger Rattan, Ph.D., completed a PRTF, evaluating plaintiff under Listings 12.04 (affective disorders), 12.05 (mental retardation), and 12.06 (anxiety-related disorders). (Tr. at 379.) Like Dr. Edelman, under the B criteria Dr. Rattan found mild limitation of ADL's; moderate limitation of social functioning; moderate difficulty in maintaining concentration, persistence, and pace; and no episodes of decompensation (Tr. at 389), with no evidence establishing the presence of the C criteria (Tr. at 390). Also like Dr. Edelman, Dr. Rattan's mental RFC report checked no significant or only moderate limitation in the mental

work activities listed thereon.  (Tr. at 393-94.)

**C.     Hearing Testimony**

Plaintiff initially appeared for a hearing pro se on November 4, 2009 (Tr. at 120), but the ALJ adjourned the matter so she could obtain counsel (Tr. at 13).  On December 17, 2009, plaintiff appeared with counsel before ALJ Ronald Bernoski.  (Tr. at 11.)  At the outset of the hearing, plaintiff's counsel agreed that her date last insured was March 2006 and amended the alleged onset date to August 16, 2007, which limited plaintiff's claim to one for SSI only.  (Tr. at 14.)

Plaintiff testified that she was twenty-five years old, 5'11", and 344 pounds.  (Tr. at 14-15.)  She had completed the ninth grade in school, taking special education classes, with no additional education or vocational training.  (Tr. at 15, 18.)  She testified that she was not currently employed and last worked for about a week in October 2006 in a factory doing packing work.  She performed that work, which required lifting under ten pounds, in a standing position.  (Tr. at 15-16.)  She testified that she was fired from that job because she was stressed, could not manage, and needed to take breaks twice an hour for about ten minutes due to anxiety attacks.  (Tr. at 16-17, 19.)  She testified to previous jobs as a restaurant cashier, dietary aide, and factory worker, from which she was fired due to confrontations with bosses and customers, inability to concentrate, and absences due to depression.  (Tr. at 17-20.)

Plaintiff testified that she received treatment from a psychiatrist, Dr. Sami, who prescribed medications (Abilify, Zoloft, and Trazodone), and a psycho-therapist, Danielle Devino, with whom she met for therapy every week or two addressing issues of anger, anxiety, and depression.  (Tr. at 21, 24.)  She previously saw a psychologist, Dr. Nelson.  (Tr. at 21.)

17

Plaintiff testified to two hospitalizations due to suicidal thoughts.  (Tr. at 22.)

Plaintiff testified that her depression caused her to feel irritable and angry, and cry a lot. (Tr. at 24.)  On a bad day, which happened about four times per month, she would stay in bed, do no chores, and not leave the house.  (Tr. at 27.)  She also testified to panic attacks two or three times a week, during which she would sweat and have a hard time breathing.  (Tr. at 24.) Plaintiff indicated that she had no friends or hobbies, slept poorly (although the Trazodone helped), and had poor energy and trouble concentrating.  (Tr. at 24-25.)  As examples of her concentration problems, plaintiff stated that she burned food while cooking, left water running, and had to re-read information.  (Tr. at 25.)  She also testified to obsessive behaviors such as repeatedly washing her hands, re-washing clean clothes and dishes, and showering two or three times per day.  (Tr. at 26-27.)

Plaintiff indicated that she had two children, a four-year-old and a six-month-old, and her mother came over every day to help her.  (Tr. at 27-28.)  The children's father also came over two or three times per week and took the kids out.  (Tr. at 28.)

Plaintiff testified that her medication generally helped her, specifically with her panic disorder, but did not help with her anger.  She indicated that within the past two years she lost her temper with her aunt, child's father, brother, mother, W-2 caseworker, and people at the bus stop and post office.  (Tr. at 29-30.)  When she lost her temper, she yelled and screamed, and got into physical fights, one of which apparently involved a knife.  She indicated that she lost her temper two or three times per month.  (Tr. at 30.)  Plaintiff testified that she also experienced edema (swelling) in the ankle area, for which she took medication and propped her feet up to waist level two hours per day.  (Tr. at 30-31.)

Plaintiff testified that her mother accompanied her grocery shopping, she could not stay

18

in the store too long, and her mother finished for her if she had to leave.  (Tr. at 32.)  Plaintiff's mother also assisted with cooking, cleaning, and laundry.  (Tr. at 32.)  She had no driver's license because she failed the road test.  (Tr. at 33.)

The VE, Beth Hoynik, classified plaintiff's factory, dietary aide, and cashier jobs as light, unskilled work.  (Tr. at 33-35.)  She testified that the limitations set forth in Dr. Sami and  Dr. Nelson's reports would preclude unskilled work.  (Tr. at 35-36.)

ALJ Bernoski left the agency due to illness before he could issue a decision.  Therefore, the SSA scheduled another hearing before a different ALJ (Tr. at 8), Timothy Malloy, which took place on March 23, 2010 (Tr. at 39).

At the second hearing, plaintiff testified that she was twenty-five years old, with two children, ages nine months and five years.  (Tr. at 43.)  Plaintiff indicated that she lived on her own with the children, but her mother came to her house two or three times per week.  Her income came from W-2.  (Tr. at 44.)  Asked if she could care for her kids, plaintiff indicated that she was managing and that her mother helped her with a lot of things.  (Tr. at 45.)  She was able to put her kids to bed, feed them, and bathe them, but she did not take them places because she did not like to leave the house.  She received no help from the state with her children.  (Tr. at 46.)

Plaintiff testified that on a good day, she tended to her children, cleaned, and washed clothes.  On a bad day, her mother came over and made sure things got done.  (Tr. at 47.)  Her mother also helped her with the shopping; if she became anxious or nervous, her mother finished the shopping for her.  Plaintiff testified that she liked to draw and write in her journal but had no hobbies.  (Tr. at 48.)  She indicated that her reading ability was fair, but she had trouble with math.  She dropped out of school in the ninth grade because she had trouble

focusing, isolated herself, and just stopped going. (Tr. at 49.) She was in special education classes. (Tr. at 50.)

Plaintiff testified that she weighed 350 pounds and had trouble losing weight because when she became depressed she ate a lot. (Tr. at 51.) Although she had always been heavy, this was the heaviest she had ever been. (Tr. at 52.) She indicated that her weight caused problems with her back, knees, and ankles, and precluded standing for too long. (Tr. at 52.)

Plaintiff further testified that she had no friends and hadn't since she moved to Wisconsin from Illinois. (Tr. at 53-54.) She testified to a past work history as a cashier, being fired from that job due to confrontations with customers and her boss, and a dietary aide, losing that job after she "got into it" with her boss. (Tr. at 54-55.) She worked in a factory through a temp service in 2006, but lost that job after about a week because the environment was too crowded and she took too many breaks. (Tr. at 55.) Plaintiff testified that when she tried to work she could not focus and panicked from being around others. (Tr. at 55.) Asked if she could work if she weren't in a crowd of people, she said "I don't know." (Tr. at 56.) Asked how long she had these problems, she said "all my life." (Tr. at 56.) She testified that she never went to the park, the movies, or the zoo. (Tr. at 58.) She did little other than play with her children. (Tr. at 58.) She indicated that she could not pick up the five-year-old, who weighed forty-five or fifty pounds, but could pick up her younger child, who weighed twenty pounds. (Tr. at 59-59.)

Regarding her depression, plaintiff testified that she saw her psychiatrist, Dr. Sami, for medications (Abilify, Zoloft, and Trazodone), and her therapist, Danielle Davino, for therapy sessions every week. (Tr. at 59-60.) She testified that the medications stabilized her, but she still felt agitated and moody. (Tr. at 60-61.) She indicated that she was able to maintain control

with her kids but argued with her mother.  (Tr. at 61.)  She testified that she was hospitalized the previous year because of suicidal thoughts.  (Tr. at 61.)  Plaintiff testified that she would like to have a job but had a problem being around people.  (Tr. at 62.)

On a bad day, which happened once a week, plaintiff testified that she cried, stayed in bed all day, isolated herself, and tended to more easily lose her temper; on those days, her mother came over and dealt with the kids.  (Tr. at 62, 68.)  She also testified to weekly panic attacks, which lasted ten or twenty minutes.  (Tr. at 63.)  The children's father came over two or three times per week and took the kids out for a few hours.  (Tr. at 63.)

Plaintiff testified that she lost her temper with her mother, kids' father, cousin, W-2 caseworker, and strangers she encountered at the post office and bus stop.  (Tr. at 63-64.)  When she lost her temper, she yelled, cursed, and threw things.  The slightest thing could set her off.  (Tr. at 64.)  She indicated that she did not sleep well, compulsively cleaned, and showered multiple times per day.  (Tr. at 64-65.)  She also had trouble focusing, burned food, left the water running, and had to re-read information.  (Tr. at 65.)  The ALJ noted that she seemed calm and collected at the hearing, and plaintiff responded that she was taking her medications and seeing her therapist.  (Tr. at 70.)  Plaintiff further testified to problems with her legs swelling, for which she took water pills and elevated her legs for two hours and walked for twenty minutes, per her doctor's recommendation.  (Tr. at 66.)

At the second hearing, the VE identified plaintiff's past work as a cashier as light, unskilled, and dietary aide as light to medium, unskilled.  However, the ALJ remarked that he did not see that as past relevant work, and plaintiff's counsel agreed.  (Tr. at 72.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, able to perform medium work; limited to simple, routine, repetitive tasks, permitting

21

her to be off-task 5% of the time; in a low stress job environment defined as only occasional decision making and only occasional changes in the work setting; and occasional contact with the public and co-workers. (Tr. at 72.) The VE testified that such a person could perform production work, hand packaging, and custodial work. (Tr. at 72-73.) If the person was limited light work, those jobs would still be available but in lower numbers. If the person was limited to sedentary work, the custodial work would be eliminated, but the person could perform a smaller number of production and hand packaging jobs. (Tr. at 73.) None of these jobs would require direct public contact, so if such a limitation were added the answer would be the same. (Tr. at 73-74.)

The VE testified that for unskilled work employers would tolerate no more than one or two absences per month. (Tr. at 75.) Nor would such an employer tolerate a person off-task 15% of the time. (Tr. at 75.) Such employers generally permit two fifteen minute breaks and one thirty minute break, so if the person required three unscheduled breaks of twenty minutes duration because of symptoms these jobs would not be available. (Tr. at 75.) Employer tolerance for angry outbursts would be "minimal if at all." (Tr. at 76.) If the person needed to elevate her legs for two hours out of eight above heart level, as Dr. Gupta stated, the person could not do even seated work. Likewise, the limitations imposed by Dr. Sami regarding work pace, responding to supervisors, and working in proximity to others would preclude all work. (Tr. at 76-77.) Dr. Nelson's limitation on fast paced work could affect the production and packaging jobs, but not the custodial work. (Tr. at 77.)

## D.    ALJ's Decision

On April 30, 2010, the ALJ issued an unfavorable decision. The ALJ found that plaintiff had not engaged in SGA since August 16, 2007, the alleged onset date, and that she suffered

from the severe impairments of obesity with symptoms of edema, an affective disorder, an anxiety disorder, and degenerative changes in her back. (Tr. at 87.) The ALJ found plaintiff's obsessive compulsive disorder and attention deficit hyperactivity disorder non-severe. He further found the allegation of a learning disorder unsupported by the record and not a medically determinable impairment. (Tr. at 87.)

At step three, the ALJ found no evidence that plaintiff met Listing 1.04 (disorders of the spine); nor did her obesity result in complications, e.g., diabetes, organ damage, cardiac problems, or other associated impairments, that met or equaled a Listing. Regarding her mental impairments, the ALJ considered Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders), finding under the B criteria mild limitation of ADL's; moderate limitation of social functioning; moderate difficulty with concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 88.) The ALJ noted that the state agency consultants' opinions generally tracked these findings, which did not establish a Listing level mental impairment. (Tr. at 89.)

The ALJ then determined plaintiff's RFC, finding her capable of light work, with the additional limitations of only simple, routine, and repetitive tasks; allowed to be off-task 5% of the time, in addition to regular breaks; a low stress work environment defined as no more than occasional decision-making and occasional changes in work setting; and only occasional interaction with co-workers. (Tr. at 89.) In making this finding, the ALJ considered plaintiff's statements about her conditions but found her "less than credible." (Tr. at 91.) The ALJ also considered the treating source reports from Drs. Nelson and Sami but found them entitled to "little weight." (Tr. at 92.) Instead, the ALJ credited the mental RFC assessments completed by the state agency consultants. (Tr. at 93.)

The ALJ found that plaintiff had no past relevant work so proceeded to step five, where, relying on the VE's testimony, he concluded that plaintiff could perform other jobs, including production worker, hand packaging, and custodial worker. He therefore found plaintiff not disabled and denied her SSI application. (Tr. at 94.)

## E.    Request for Appeals Council Review

Plaintiff sought review of the ALJ's decision by the Appeals Council (Tr. at 6), submitting additional records from Dr. Gupta dated January 9, 2009 through February 15, 2010 (Tr. at 4-5). However, because the Council denied plaintiff's request to review the ALJ's decision, this evidence, although technically a part of the administrative record, cannot be considered in determining the correctness of the ALJ's decision. Diaz v. Chater, 55 F.3d 300, 305 n.1 (7th Cir. 1995); Eads v. Sec'y of the Dep't of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).

## IV.  DISCUSSION

Plaintiff argues that the ALJ improperly evaluated the treating source reports and omitted from the RFC additional limitations set forth in those (and the state agency consultants') reports. The opinion of a social security claimant's treating doctor must be given controlling weight if it is "well-supported" and "not inconsistent with the other substantial evidence" in the record. Scott, 2011 WL 3252799, at *5 (quoting 20 C.F.R. § 404.1527(d)(2)). If the ALJ discounts the opinion of a treating physician, he must offer "good reasons" for doing so. Id. (citing Martinez v. Astrue, 630 F.3d 693, 698 (7th Cir. 2011)). Even if there are sound reasons for refusing to give the report controlling weight, the ALJ may not simply reject it; rather, the ALJ must determine what value the report does merit, considering the length,

nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the opinion. Id. (citing Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(d)(2)). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p.

The record in this case contains reports from three treating sources. The ALJ erred in evaluating each of them.

## A. Dr. Gupta

Dr. Gupta opined, inter alia, that plaintiff needed to elevate her feet for two hours per day, a restriction the VE said would preclude unskilled work. The ALJ provided five reasons for giving Dr. Gupta's opinion little weight: (1) Dr. Gupta offered no explanation for her conclusions; (2) it was unclear from the record what relationship Dr. Gupta had with plaintiff or how long it existed; (3) the record contained no evidence that plaintiff ever had to elevate her legs for two hours per day, with plaintiff herself not even making such an allegation; (4) the objective evidence showed only a mild back impairment and obesity; and (5) plaintiff was able to care for her two children. (Tr. at 92.) These are not "good reasons."

First, Dr. Gupta's notes indicate that she advised plaintiff to elevate her legs approximately two hours per day (and walk twenty minutes per day) in order to combat lower extremity edema. (Tr. at 527.) If the ALJ required a further explanation he could have re-contacted Dr. Gupta and asked for one. See 20 C.F.R. § 404.1512(e)(1).

Second, the record is not unclear as to plaintiff's relationship with Dr. Gupta. The treatment notes indicate that plaintiff saw Dr. Gupta, her family practice physician, on numerous occasions and for a variety of concerns between August 2009 and March 2010. (Tr.

at 519-42.)

Third, plaintiff did claim that she elevated her legs. At the first hearing, she testified that she experienced edema, for which she took medication and propped her feet up to waist level two hours per day. (Tr. at 30-31.) At the second hearing, she testified that due to problems with her legs swelling she took water pills and elevated her legs for two hours and walked for twenty minutes per day, consistent with her doctor's recommendation. (Tr. at 66.)

Fourth, even assuming that the ALJ was correct in stating that plaintiff's back impairment was "mild,"[3] the ALJ failed to explain how this observation weakened Dr. Gupta's opinion about edema and leg elevation. And plaintiff's obesity cannot reasonably be called "mild." She stood 5'11" and weight about 350 pounds, a BMI of 48.8, well above the BMI of 30 qualifying a person as obese.[4] Under SSR 02-01p, plaintiff exhibited Level III, or "extreme" obesity, representing the greatest risk for developing obesity-related impairments.

Fifth, the ALJ failed to explain how Dr. Gupta's restrictions were inconsistent with plaintiff's ability to care for her children. As the Seventh Circuit has noted, caring for a small child at home permits "a degree of flexibility that work in the workplace does not." Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005). A person tending children in her home might be able to elevate her feet in a recliner for two hours, but she could not expect to be allowed to do that on a production line or custodial crew.

The ALJ placed great weight on plaintiff's ability to care for her children in this case, despite frequent holdings that child care in the home should not be equated with work outside

_____

[3]He did find it a "severe" impairment.

[4]See http://www.nhlbisupport.com/bmi/bmicalc.htm.

26

the home.  See, e.g., Gentle, 430 F.3d at 867; McGee v. Astrue, 770 F. Supp. 2d 945, 947 n.1 (E.D. Wis. 2011); Sucharski v. Astrue, No. 08-C-0284, 2009 WL 3148724, at *16 (E.D. Wis. Sept. 25, 2009).  As the Seventh Circuit has explained, the "pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."  Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006); see also Shramek v. Apfel, 226 F.3d 809, 813 (7th Cir. 2000) (holding that the ALJ erred in finding the claimant's ability to care for the house and her children inconsistent with the need to rest and elevate the legs when necessary). Moreover, a parent must care for her children, or else abandon them to the state or relatives, which may impel her to efforts not transferrable to the work place.  Gentle, 430 F.3d at 867. In any event, the record in this case suggests that plaintiff received much help from her mother in caring for the children, particularly on "bad days," a qualifier the ALJ overlooked.  See id. (remanding where the ALJ ignored the assistance the claimant received with household chores).

The Commissioner argues that while the need to elevate one's legs two out of eight hours at work would preclude the jobs identified by the VE, Dr. Gupta did not state that plaintiff had to do this during the workday.  However, the ALJ did not make this observation in rejecting Dr. Gupta's report, and "principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ." Steele, 290 F.3d at 941.  The Commissioner also suggests that the VE did not preclude all work based on Dr. Gupta's restrictions, just the specifically identified jobs.  But those are the jobs the ALJ relied on at step five; if plaintiff cannot do them, the agency's step five burden is unmet.

## B.    Dr. Nelson

Dr. Nelson, in her September 5, 2007 report, opined that plaintiff had major depression, a panic disorder, and a learning disability, with a GAF of 45.  She noted severe limitations regarding public contact, detailed/complex tasks, interaction with co-workers and supervisors, work hazards, strict deadlines, and fast-paced tasks.  (Tr. at 397.)  In her February 15, 2008 report, Dr. Nelson indicated that plaintiff had difficulty with following instructions, working around others, controlling anger, and impulse control.  She also had a low tolerance for frustration, made socially inappropriate responses to situations, and suffered panic attacks.  Dr. Nelson concluded that plaintiff was unable to participate in any activities within these restrictions.  (Tr. at 377-78.)

The ALJ also gave Dr. Nelson's reports little weight, finding her conclusions "too extreme."  (Tr. at 92.)  In support of this assessment, the ALJ stated that (1) Dr. Nelson's notes did not support a conclusion that plaintiff had a learning disorder; (2) plaintiff was the primary care-giver for two children and was "presumabl[y] capable of some level of work activity as exemplified by those parental responsibilities"; and (3) the treatment notes depicted a relatively stable condition with some improvement from therapy.  The ALJ concluded: "She has not shown the extreme level of limitations as described in the above referenced opinions."  (Tr. at 92.)  Again, these are not good reasons.

First, the record contains evidence that plaintiff participated in special education classes before dropping out of school in the ninth grade.  (Tr. at 49, 302.)  In any event, the ALJ failed to explain why the absence of evidence of a learning disability impugns the other limitations set forth in Dr. Nelson's reports based on plaintiff's affective and anxiety disorders, which the ALJ agreed were severe.

28

Second, as discussed above, plaintiff's ability to care for her children did not permit the ALJ to presume that she could work. Caring for children inside the home is not the same thing as working outside the home, and in any event plaintiff received significant help from her mother.

Third, the ALJ read too much into the treatment notes finding plaintiff "stable." "One can be stable and yet disabled." Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004). Likewise, there "can be a great distance between a patient who responds to treatment and one who is able to enter the workforce." Scott, 2011 WL 3252799, at *5. The ALJ's citation of treatment notes reflecting improvement "reveals an all-too-common misunderstanding of mental illness. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." Scott, 2011 WL 3252799, at *5 (citing Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011); Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010); Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008)).[5]

The ALJ credited the mental RFC assessments completed by the state agency consultants, which indicated that plaintiff was either not significantly or moderately limited in all areas of mental activity. (Tr. at 93.) However, but such reports, standing alone, do not constitute substantial evidence justifying the rejection of a treating source's opinion. Gudgel

_____

[5]Davinio's progress notes permitted the author to check "stable," "improving," or "deteriorating" (e.g., Tr. at 415), so it cannot be inferred from the indication that plaintiff was "stable and maintaining current status," which Davino checked virtually every time, that plaintiff was doing well or getting better.

v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).[6]

## C.    Dr. Sami/Davino

In their November 3, 2009 report, Dr. Sami and therapist Davino stated that plaintiff suffered from major depression and rule-out bipolar disorder, with moderate limitations in ADL's, social functioning, and concentration, and three episodes of decompensation.  They further concluded that she would be absent from work about four days per month due to her impairments; that she would have marginal adjustment to change such that even a minimal increase in mental demands would cause her to decompensate; and she would have a number of significant mental limitations in her ability to sustain activities on an ongoing basis in a competitive work environment.  (Tr. at 92; 411-13.)

The ALJ also gave this opinion little weight because: (1) plaintiff was the primary care-giver for two children and was able to maintain sufficient activities of daily living, concentration, and social interaction to provide for her children; (2) she had been hospitalized on two occasions but received some benefit from therapy and medication, and at least one of her hospitalizations followed a period where she was not taking her medication; and (3) there was little evidence to support a finding that she had a marginal ability to adjust to change, with her therapy records showing that she had generally been able to withstand ongoing family, anger, and anxiety problems without decompensating.  (Tr. at 92-93.)

These reasons also do not withstand scrutiny.  First, as explained above, child-rearing in the home cannot be equated with work.  Further, the record suggests that plaintiff isolated

_____

[6]Plaintiff argues that the ALJ also omitted certain limitations set forth in the consultants' reports.  The ALJ must on remand include in the RFC and his questions to the VE all limitations supported by the evidence.

herself, had significant difficulty taking her kids places, and took her mother with her to shop. (E.g., Tr. at 46, 48, 415, 438.)

Second, as also discussed above, benefit from treatment cannot be equated with the ability to work, and the record contains explanations for why plaintiff did not take her medications, e.g., she lacked insurance/ability to pay (Tr. at 462) and concerns about side effect (Tr. at 539), which the ALJ overlooked. Cf. SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.").

Third, the record suggests that plaintiff's relationships with her family, ex-boyfriend, and even strangers were tendentious, at times violent, evidence the ALJ did not meaningfully confront. See Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003) (stating that while the ALJ need not discuss every piece of evidence in the record, he may not ignore evidence that is contrary to his ruling).

## V. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. Because there are unresolved material factual issues, and the record as it stands does not clearly support a finding of disability, the proper remedy is remand for further proceedings rather than a judicial award. See Neave v. Astrue, 507 F. Supp. 2d 948, 966-67 (E.D. Wis. 2007). The ALJ must on remand reconsider the treating source reports and include in the RFC all limitations

supported by the evidence. The ALJ should also reconsider plaintiff's credibility, as his analysis

of this issue suffered from similar flaws.[7]

Plaintiff asks that the case be remanded to a different ALJ. Absent evidence of bias or

partiality, however, I generally may not order that the case be assigned to a different judge.

---

[7]In assessing credibility, the ALJ first repeated the well-worn statement "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. at 90.) The Seventh Circuit has soundly rejected this sort of credibility finding. See Martinez, 630 F.3d at 694. The ALJ went on to provide several reasons for finding plaintiff "less than credible." (Tr. at 91.) First, he noted that when plaintiff filed her application she did not allege a physical disability; instead, her primary focus was on her mental impairments, yet she did not receive mental health treatment until 2007. But plaintiff amended her disability onset date to 2007; thus, it is unclear why the lack of treatment prior to that date should undercut her claims. Second, the ALJ noted that plaintiff had a sporadic work history. The observation was factually correct, but the ALJ failed to explain its significance. In a case such as this, where the claimant alleges disability based in large part on a chronic condition (rather than some traumatic injury), employment history may mean little absent further evaluation as to why the work record is limited. See Sarchet, 78 F.3d at 308 (rejecting the ALJ's reliance on poor work history where the claimant long suffered from numerous impairments that made her unemployable). Third, the ALJ noted that since her last work attempt plaintiff received treatment, benefitting from therapy and medication management. As discussed above, the ALJ read too much into these notes. The ALJ also made much of the fact that plaintiff attended a wedding out of state, but the treatment note discussing this trip goes on to state that plaintiff "felt panicky," which she dealt with by taking to her sister, walking, and maintaining space. (Tr. at 425.) The ALJ may not "cherry-pick" from the record to support a denial of benefits. See Scott, 2011 WL 3252799, at *5. Fourth, the ALJ noted that at the hearing plaintiff presented herself as an articulate young person who was able to respond appropriately to questioning. An ALJ's assessment of a claimant's demeanor is entitled to deference, but here the ALJ failed to explain how this observation made plaintiff's claims less credible. Fifth, the ALJ noted that although she received help from her mother plaintiff was the primary care-giver for her two children and had been effective in raising them. The record suggests that plaintiff received more help with her kids than the ALJ appreciated, but in any event and as discussed in the text, raising kids does not mean a person can work outside the home. Sixth, the ALJ noted that at the time of one of her previous hospitalizations, plaintiff had not been taking her medication. As also discussed in the text, an ALJ should not "draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p.

Neave, 507 F. Supp. 2d at 967 (citing Sarchet, 78 F.3d at 309). Plaintiff does not allege bias, and I see no evidence of that. Courts may recommend that the Commissioner assign the matter to a different ALJ, with such recommendations being particularly appropriate where the ALJ has produced multiple defective opinions, see, e.g., Ramos v. Astrue, 674 F. Supp. 2d 1076, 1094-95 (E.D. Wis. 2009); Harris v. Barnhart, 219 F. Supp. 2d 966, 977 (E.D. Wis. 2002), or the tone of the decision suggests an "unshakable commitment to denial," see, e.g., Windus, 345 F. Supp. 2d at 952. The ALJ made mistakes here, but the record suggests no strong basis for directing the case to another judge. The Commissioner is, of course, free to reassign the case if he deems it appropriate.

Dated at Milwaukee, Wisconsin this 12th day of August, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge